**STATE of Missouri, Plaintiff–Respondent,**

v.

**Juan MUBARAK, Defendant–Appellant.**

No. 26037.

Missouri Court of Appeals, Southern District, Division I.

June 1, 2005.

Nancy A. McKerrow, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Alison K. Brown, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JAMES K. PREWITT, Judge.

Following jury trial, Juan Mubarak ("Appellant") was convicted of assault in the first degree (§ 565.050, RSMo 2000) and armed criminal action (§ 571.015, RSMo 2000), on November 5, 2003. Appellant was sentenced as a prior and persistent offender to thirty years' imprisonment on the first-degree assault conviction and ten years' imprisonment on the conviction for armed criminal action. Appellant appeals his convictions, presenting two points for review.

The State charged Appellant under Count I with the class A felony of assault in the first degree, alleging that he "knowingly caused serious physical injury to William Hendricks by stabbing him." Section 565.050, RSMo 2000, provides:

> 1. A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person.
>
> 2. Assault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony.

"Serious physical injury" is defined under § 565.002(6), RSMo 2000, as "physical injury that crates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body[.]" Under § 556.061(20), RSMo 2000, "physical injury" is defined as "physical pain, illness, or any impairment of physical condition[.]"

Under Count II, the State charged Appellant with the felony of armed criminal action, contending that Appellant committed assault in the first degree "by, with and through the use, assistance and aid of a dangerous instrument[,]" in accordance with § 571.015.1, RSMo 2000.

■ Appellant's first point asserts that the trial court erred in denying Appellant's motion for judgment of acquittal at the close of the evidence because there was insufficient evidence to prove his guilt beyond a reasonable doubt, in that the testimony of four witnesses was contradictory and could not be relied upon.

On appellate review of a challenge to the sufficiency of the evidence upon which a defendant was convicted, our review is limited to a determination of whether there is substantial evidence from which a reasonable juror might conclude that defendant is guilty beyond a reasonable doubt. *State v. Shipp*, 125 S.W.3d 358, 359 (Mo.App. 2004). Evidence and reasonable inferences derived therefrom will be viewed in a light most favorable to the verdict. *Id.*

In the summer of 2002, William Hendricks ("Victim") was a cell phone tower installer for Capitol Tower & Communication and was working in Springfield. After work on June 10, 2002, Victim and others from his crew went to the Pink Cadillac ("the club"), a "strip club" located in Springfield. According to Victim, he became "pretty intoxicated" in the course of the evening. Victim could not recall that any altercation had occurred inside the club that night.

At closing time, Victim and his co-workers were invited by some of the dancers at the club to an "after-hours" party. Victim and his co-workers agreed to go, and they climbed into a white station wagon driven by Sapphire, an employee of the club. As they were ready to drive off, a black Lexis vehicle driven by Appellant pulled up. Appellant was accompanied by Rachel Adkins and Mary Darden–Widemann, who were dancers at the club, and Justin Loudermill

and Michael Harter, friends of Appellant. All had been at the club that night. Adkins asked Sapphire why she was not going with them. Victim testified that at this point, he got out of the station wagon to hail a cab.

Victim stated that he was attacked from behind by a group of men who, he thought, intended to rob him. They grabbed his hands and arms, but Victim resisted and ran away. Victim testified that his running abilities were impaired by alcohol, and he ran across Glenstone Avenue, by some buildings, and down a railroad track. As he ran down the tracks, he "was hit in the back with some kind of sharp object." Victim fell to the ground, tried to defend himself from his attackers, got up to run again, and was hit from behind with the same sharp object. The next thing Victim remembered was being in the hospital with four to six puncture wounds in his back caused by an ice pick.

Rachel Adkins testified that she was working as a dancer at the club on June 10, 2002. She said she was intoxicated throughout the night. After her shift ended and the club closed, she joined Appellant, Darden–Widemann, Harter, and Loudermill in Appellant's Lexus. They saw Sapphire outside and drove over to talk to her. She testified that when they approached the station wagon, Victim began yelling out the window, calling those in the Lexus "niggers" and "kept running his mouth." She stated that Harter yelled back, and Appellant, Harter and Loudermill got out of the Lexis. She saw Harter hit Victim after Victim had taken a swing at him, and Appellant and Harter chased Victim down Glenstone Avenue. Loudermill followed behind them.

Adkins and Darden–Widemann remained in the Lexus, with Darden–Widemann behind the wheel. The women attempted to get Appellant, Harter and Loudermill back into the car. When they were back in the car, Appellant made some reference to an ice pick. Adkins stated that she later helped Harter wash blood off his hands and shirt at Appellant's apartment. She gave several other blood-covered articles of clothing to Darden–Widemann to wash. She presumed the clothing belonged to Appellant and Harter.

Mary Darden–Widemann, a dancer at the club who was engaged to Appellant, was present at the club on June 10, 2002. She testified she was not working due to surgery she had earlier in the day. She stated that the combination of anesthetics administered during surgery and alcohol she consumed made recollection difficult. She testified that she saw Victim and Harter fighting at one point inside the club that evening. She said that Victim later grabbed Adkins while she was dancing. She explained that Harter had a relationship with Adkins, and she testified this further aggravated Harter towards Victim. When she left the club with Appellant, Harter, Loudermill and Adkins, she saw Sapphire and asked her to join them. Sapphire was with a friend and Victim in a white station wagon, and she warned Sapphire about dating customers.

Darden–Widemann said that Victim had "smarted off" to the men before entering Sapphire's station wagon. He was stretched out in the back of car but continued verbally abusing the men through an open window. Darden–Widemann stated that as Victim got out of the station wagon, he continued to yell specifically at Harter. She saw Victim shove Harter and start a fight that included Loudermill. This fight moved to the other side of the club, then to the other side of the street. Victim was knocked down but proceeded to verbally taunt Harter and Loudermill. After a few moments, Victim got up and started after Loudermill as Harter walked away.

Victim, Harter and Loudermill ran across Glenstone Avenue, but Harter came back to the Lexis. When they saw that Victim had Loudermill down on the ground, Harter crossed the street again, and Appellant ran after him. Darden–Widemann got Adkins into the car, and she drove to pick up Appellant, Harter and Loudermill. Appellant jumped into the car first, followed by Harter and then Loudermill. Darden–Widemann testified that only Harter and Loudermill attacked Victim; Loudermill was jumping on Victim's head and Harter hit him in the back. She testified that Appellant did not say anything after he was back in the car. She further stated that she never saw Appellant with an ice pick that evening nor could she recall seeing an ice pick in his car. Darden–Widemann was aware that Appellant possessed an ice pick and stated that she had seen it on a few occasions.

Later, at Appellant's apartment, Darden–Widemann saw Appellant cleaning his shoes and replacing the laces. She said this was a habit of Appellant and had nothing to do with the possibility that he had blood on his shoes. When asked about why Appellant had decided to paint his black Lexus white after the incident, Darden–Widemann stated that the painting was scheduled before the incident.

Michael Harter also testified. In exchange for his testimony, Harter entered a plea of guilty to the charge of assault in the second degree, and the armed criminal action charge was dropped. The State agreed to recommend a four-year sentence, and sentencing was delayed until after Appellant's trial. In his testimony, Harter stated that he, Loudermill, Darden–Widemann, and Appellant arrived at the club around 9:00 p.m. that night. He had been at Loudermill's house where he drank "five or six beers and a couple of shots" prior to going to the club. Harter stated that he drank five or more pineapple-vodka mixtures at the club; to the point where he became sick. He acknowledged that he might have taken drugs that day as well. Harter testified that prior to closing time, Darden–Widemann told him that Victim was "hitting on" Adkins, and was "talking shit" at Harter and Loudermill. Harter contended that neither piece of information caused him much aggravation. He denied that any problem had occurred inside the club earlier in the evening.

Harter testified that after the club closed, he, Appellant, Loudermill, Adkins, and Darden–Widemann were standing outside at Appellant's Lexis when Victim approached the group, called Loudermill a "nigger," and punched Harter in the face. Harter testified that he and Loudermill then fought with the victim for three to four minutes, and after Victim was on the ground, Harter and Loudermill walked away. Harter stipulated that no one ever grabbed Victim by the hands or arms for the purpose of robbing him. He stated that Appellant began to chase Victim once he got up off the ground, and he and Loudermill followed shortly in pursuit. The three men chased Victim into the street. Harter testified that Appellant and Loudermill were faster than he and caught up with Victim faster. By the time Harter arrived, he saw Appellant attacking Victim and delivering blows to Victim's back with the side of his fist. After the attack, Harter stated he saw a black handle sticking out of Victim's back.

Harter testified that the three men got back into Appellant's Lexus and drove "back roads" to Appellant's apartment. At Appellant's apartment, Harter noted that there was no blood on anyone's clothing. He also testified that Appellant admitted to stabbing the victim, saying: "He said, 'I stabbed him. I stuck him and left it in.' "

Harter also testified that Appellant had his Lexus painted white the next week because "all the witnesses [had] seen it."

Justin Loudermill testified on behalf of the State. He entered a plea of guilty to a charge of assault in the second degree for his participation in the attack on Victim, and his sentencing was also delayed until after his testimony at Appellant's trial. He testified that he was with Harter and Appellant at Appellant's house and that the three of them had been drinking that evening before they went to the club. Once at the club, they continued drinking. Loudermill stated he did not notice any altercation inside the club, but he did hear Darden–Widemann complain that a "bald, goateed customer" (similar to Victim's appearance) was harassing some of the dancers.

Loudermill testified that Appellant, Adkins, Harter, and Darden–Widemann left the club at closing. He described himself as "very intoxicated." He remembered standing at the rear of Appellant's Lexis and speaking with one of the dancers. Loudermill stated that he noticed a white station wagon pulling up very close to the Lexus, but nothing seemed out of the ordinary to Loudermill until he heard Victim inside the car "yelling at [Harter]." Harter yelled back at Victim. Loudermill testified that Victim got out of the station wagon, hit Harter in the face with an open palm, and the two began to fight. The fight "moved around the parking lot[,]" and Victim was knocked down in the process. When Loudermill began walking towards the fight, Victim got up and started to approach Loudermill, but then Victim fell down. Victim and Loudermill began to fight, but Loudermill stated that Victim was so intoxicated that he was only able to take a "few swings," so he felt safe walking away.

According to Loudermill, at this point Appellant got out of his Lexis and began walking towards Victim. Loudermill stated that Harter had his back turned to Appellant and did not see Appellant's confrontation with Victim. Loudermill testified that Appellant had an object in his hand, "a black handle, like an ice pick." Loudermill identified an ice pick marked as an exhibit as the object in Appellant's hand. Loudermill testified that when all three men were back in the Lexis, Appellant complained of "not being able to get 'it' out" and then said, "I can't believe I did that. I didn't mean to do that." On cross-examination, Appellant's attorney noted that during police questioning, Loudermill attributed the "not being able to get 'it' out" line to Harter. At trial, Loudermill reiterated this statement, saying that both Harter and Appellant attempted to dislodge the ice pick from Victim's spine.

Springfield Detective Ronnie Long canvassed the area around the crime scene and learned that a nearby business had five surveillance cameras operating during the same time as the incident. Upon review of the videos, Detective Long observed images showing a black car and a white car pulling up an alley south of the club and two shadowy figures emerging from the cars. Three people were also seen running through the parking lot with one person following quickly thereafter. After reviewing the video, Long discerned something that looked a person being stabbed.

The attack on Victim was so intense that his watch flew off during the beating, and Appellant's shoe fell off due to the sheer force of his contact with Victim. The attack left four to six puncture wounds in Victim's back and an ice pick lodged in Victim's spine. Victim testified that one of the puncture wounds he sustained was located between two vertebrae, causing his

right leg to be paralyzed for some time. He also suffered a punctured lung, and as a result, he was unable to speak for several months. After several months in which he was bed-ridden, he was confined to a wheelchair for another month, and then able to walk using crutches and later with a cane. He testified that he could not perform his normal work duties for six months following the attack. At the time of trial, Victim still experienced problems with his right leg buckling under his weight, and he testified that he tires quickly.

Appellant contends that, in ascertaining whether the verdict was supported by substantial evidence, "this Court should keep in mind that all four of the eyewitnesses were extremely intoxicated and/or drugged .... [and] that both Harter and Loudermill received very favorable deals with the state in exchange for their testimony against Appellant." Appellant also points out various inconsistencies in the eyewitnesses' testimonies that "leaves the mind clouded with doubt and makes Appellant's guilt extremely doubtful."

■ A jury is free to believe all, some or none of the witness' testimony in light of the facts, circumstances and other testimony. *Shipp*, 125 S.W.3d at 359. "A defendant is not entitled to a judgment of acquittal merely because of discrepancies or conflicts in the testimony of the State's witnesses." *State v. Newberry*, 605 S.W.2d 117, 121 (Mo.banc 1980). The fact that a witness' testimony is contradictory does not prevent it from constituting substantial evidence. *Id.*

■ Respondent notes that Appellant's argument relies on discrediting testimony because there are contradictory facts presented by each witness. In the usual case, the appellate court reviews all evidence and all reasonable inferences therefrom in the light most favorable to the verdict.

*Shipp*, 125 S.W.3d at 359. However, when witnesses at trial make several patently contradictory statements about vital elements of the case at trial, this may rob that witness' testimony of all probative force. *State v. Sutton*, 896 S.W.2d 543, 544 (Mo.App.1995).

■ This rule "does not apply to contradictions between trial testimony and prior out-of-court statements, to contradictions as to collateral matters, or to inconsistencies not sufficient to make the testimony inherently self-destructive." *State v. Cole*, 148 S.W.3d 896, 902 (Mo.App.2004) (quoting *T.L.C. v. T.L.C.*, 950 S.W.2d 293, 295 (Mo.App.1997)). Also, it does not apply "where the inconsistencies are between the victim's statements and those of other witnesses; the latter types of inconsistencies in testimony simply create questions of credibility for jury resolution." *Id.*

The jury had sufficient evidence to convict Appellant based on consistent eyewitness testimony and video surveillance that matches the testimony. The jury heard testimony from Michael Harter that he witnessed Appellant attacking Victim and delivering blows to Victim's back, and when Appellant walked away from Victim, Harter saw a black handle sticking out of Victim's back. Justin Loudermill testified that Appellant approached Victim holding an ice pick in his hand, and Appellant later stated he was not "able to get it out."

None of the discrepancies or inconsistencies sufficiently attacks the actual incident at issue. Appellant, Harter, and Loudermill chased Victim down and attacked him. The victim was attacked and suffered four to six puncture wounds to the back. Victim was also seen with a black handle sticking out of his back after Appellant fought him. Two witnesses testified that Appellant stabbed Victim in the back with an ice pick. Point I is denied.

■ In Point II, Appellant contends that his consecutive thirty-year and ten-year sentences constitute cruel and unusual punishment. Specifically, Appellant points to the "grossly disproportionate" nature of the difference between his convictions and those of his co-defendants.

■ "A punishment is not cruel and unusual because of its duration unless so disproportionate to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *State v. Brownridge*, 353 S.W.2d 715, 718 (Mo. 1962). "A punishment is not cruel simply because it is severe." *Id.*

■ The United States Supreme Court stated the test to determine what constitutes proportionality of a sentence in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983): "(1) An examination of the gravity of the offense and the harshness of the penalty; (2) a comparison of the sentences imposed on other criminals in the same jurisdiction; and (3) a comparison of the sentences imposed for commission of the same crime in other jurisdictions." *State v. Lee*, 841 S.W.2d 648, 654 (Mo.banc 1992) Comparison to sentences given to other defendants for the same or a similar crime is irrelevant except when the court finds the sentence in question grossly disproportionate. *Id.*

■ Appellate courts give great deference to the legislature's prescription of punishment. *State v. Sullivan*, 935 S.W.2d 747, 760 (Mo.App.1996). When the sentence imposed is within the range prescribed by statute, it cannot be judged excessive, and the consecutive effect of the sentences does not constitute cruel and unusual punishment. *Id.*

The court sentenced Appellant under terms allowed by the statutes. No error in sentencing is present. Point II is denied.

The judgment is affirmed.

GARRISON, P.J., and RAHMEYER, J., concur.