STATE of Missouri, Plaintiff–
Respondent,

v.

Lawrence T. ARNOLD, Defendant–
Appellant.

No. 27406.

Missouri Court of Appeals,
Southern District,
Division Two.

March 5, 2007.

204

Rosalynn Koch, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Cecily L. Daller, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Judge.

Lawrence T. Arnold ("Defendant") was convicted following a jury trial of the class A felony of attempted escape from confinement, in violation of § 575.210,[1] the unclassified felony of armed criminal action, in violation of § 571.015, and the class A felony of kidnapping, in violation of § 565.110.[2] Defendant was sentenced as a prior and persistent offender, under § 558.016,[3] to consecutive terms of 30 years for attempted escape, 250 years for armed criminal action, and life imprisonment for kidnap-

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

2. Section 565.110, RSMo Cum.Supp.2004 (effective June 17, 2004).

3. Section 558.016, RSMo Cum.Supp.2003.

ping. On appeal, Defendant contends the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence, entering judgment against him, and sentencing him on his convictions. Defendant contends the State did not present sufficient evidence to prove beyond a reasonable doubt that he committed attempted escape and armed criminal action by using a dangerous instrument, or that he used his alleged kidnapping victim as a hostage or a shield. We affirm.

## I. Factual and Procedural Background

The State presented its case through the testimony of four officers who were present at the Miller County Adult Detention Center during the events that occurred on July 21, 2004. Officers Vicki Fields ("Officer Fields"), John Freeman ("Officer Freeman"), and Fred Perkins ("Officer Perkins") are correctional officers at the jail who were working the 4 p.m. shift together. Officer Billy Risen ("Officer Risen") is a road sergeant with the Miller County Sheriff's Department who was patrolling between 4 and 6 p.m. and was dispatched to the jail. According to their testimony, the following events transpired on that date.

During the first part of Officer Field's shift, she and Officer Perkins were working in the booking area of the jail. Defendant and another inmate, John Reynolds ("Reynolds"), asked to do some legal research, and Officer Fields retrieved them from their housing area and brought them down to a holding cell in the booking area that contained a cart with some legal books. While they were locked in the cell doing research, Officer Perkins left to take the elevator up to the observation tower and relieve Officer Freeman, who was working in the tower. After Officer Perkins left, Defendant and Reynolds asked

Officer Fields to make some copies for them on the copy machine located in the hallway of the booking area. As Officer Fields unlocked the door to the cell to retrieve the book, the two inmates rushed the door, and Reynolds grabbed Officer Fields around the neck and forcefully pushed a sharp object to her neck underneath her jaw bone. Defendant told Reynolds to "go ahead and kill [her]." Reynolds whispered in Officer Fields' ear that if she did everything Defendant said, she would not be hurt.

Just after Officer Perkins arrived in the tower to relieve Officer Freeman, Officer Freemen looked at the tower's monitors and saw that Defendant had entered the booking area, where he was not supposed to be. Officer Freeman immediately told Officer Perkins to contact dispatch for back-up, and took the elevator down. When the elevator doors opened, Officer Freeman saw Defendant running toward him with Officer Fields' duty belt in hand. Defendant and Officer Freeman shoved each other into the booking area, where Officer Freeman saw Reynolds holding Officer Fields around the neck from behind with an ink pen to her throat. At that point, both Defendant and Reynolds beat and kicked Officer Freeman to the floor until he was unconscious.

Defendant then handcuffed one of Officer Fields' arms and grabbed the other end of the handcuffs, pulling her down the hallway toward the door that opens into the deputies' room. That room leads to an electronically secured door which accesses the outside of the jail. Officer Risen was in the deputies' room when he saw Defendant open the door and enter with Officer Fields in front of him, holding her around the neck with a ball-point pen to her throat. Officer Risen, with his gun drawn, but pointed away from Defendant and Officer Fields, told Defendant he could not

leave and needed to put the pen down, but Defendant responded that unless Officer Risen allowed him to leave, "he was going to kill her." Officer Risen again told Defendant he could not let him leave, and Defendant said that he needed to be released or else he would kill someone. When Officer Risen refused for a third time to let him leave, Defendant retreated back through the door, pulling Officer Fields with him.

Defendant proceeded to run from one end of the hallway to the other and back again numerous times, pulling Officer Fields along with him and negotiating with people at the doors on either end. He ordered Officer Fields to tell the negotiators that he had a gun, and she complied. Meanwhile, Reynolds gave up and locked himself in a holding cell. Defendant and Reynolds were eventually taken back into custody, about three hours after they initially accosted and apprehended Officer Fields.

At the close of the State's evidence, Defendant filed a motion for judgment of acquittal. The trial court denied the motion.

The defense case was presented via the testimony of three witnesses. For purposes of this appeal, the relevant testimony was provided by Defendant.[4]

Defendant testified that although Reynolds had been talking for a few days about escaping by going down to do legal research and taking Officer Fields hostage, he did not know Reynolds was planning on doing it this particular time they went to research. Reynolds was the one who rushed the door and grabbed Officer Fields, and Defendant did not come out of the cell immediately. When he did come

out, he walked down the hall and met up with Officer Freeman, who swung at him and tried to mace him. They got into a fist fight, and Defendant told Officer Freeman to stay down on the floor and quit fighting. He never held Officer Fields hostage or told anyone he would kill her, or held a pen to her throat; only Reynolds did that. But Defendant admitted that he began negotiating with officers "[p]retty much immediately," that he held onto Officer Fields and stood her in front of him as he tried to enter the deputies' room, and that he placed her in handcuffs.

At the close of all the evidence, Defendant filed another motion for judgment of acquittal. The trial court also denied that motion. After Defendant was convicted, he appealed.

## II. Standard of Review

██ Our role in reviewing a challenge to the sufficiency of the evidence upon which a defendant was convicted is limited to a determination of whether there is substantial evidence from which a reasonable juror might conclude that the defendant is guilty beyond a reasonable doubt. *State v. Mubarak,* 163 S.W.3d 624, 626 (Mo.App.2005). We accept as true all evidence and reasonable inferences drawn therefrom tending to support the verdict, and we disregard all evidence and inferences to the contrary. *State v. Escoe,* 78 S.W.3d 170, 172–73 (Mo.App.2002). "The question is whether the evidence viewed in a light most favorable to the State, is sufficient to support the verdict." *State v. Collins,* 188 S.W.3d 69, 73 (Mo.App.2006). This court will give great deference to the trier of fact and will not act as a "super juror" with veto powers. *Escoe,* 78 S.W.3d at 172. "Therefore, we do not weigh the

---

4. The other testimony concerned the chain of custody of the pen and a telephone conversa-

tion that occurred during the escape attempt.

evidence or determine the reliability or credibility of witnesses." *State v. Daniels*, 179 S.W.3d 273, 285 (Mo.App.2005).

◼ Defendant initially filed a motion for judgment of acquittal at the close of the State's case. After that motion was denied, Defendant presented evidence on his own behalf. Thereafter, the trial court denied Defendant's subsequent motion for judgment of acquittal filed at the close of all the evidence. "We take note of this procedural posture because it affects the scope of our review." *State v. Mitchell*, 203 S.W.3d 246, 249 (Mo.App.2006). " 'When a defendant introduces evidence on his own behalf, after the overruling of his motion for judgment of acquittal at the close of the State's case, the sufficiency of the evidence must be determined upon the entire record considering any incriminating evidence developed during the defendant's case.' " *Id.* (quoting *State v. Rivers*, 554 S.W.2d 548, 550 (Mo.App.1977)).

## III. Discussion

### *Point I—Ink pen used as a dangerous instrument*

◼ In his first point relied on, Defendant contends the State did not present sufficient evidence to prove beyond a rea-

sonable doubt that he committed attempted escape and armed criminal action by using a dangerous instrument, because the ink pen "did not create a danger of death or serious physical injury." Defendant was charged with attempted escape from confinement, in violation of § 575.210.[5] Defendant was also charged with committing armed criminal action in violation of § 571.015.[6] The jury was instructed that in order to convict on the offense of attempted escape the State had to prove beyond a reasonable doubt that: (1) Defendant and Reynolds overpowered Officer Fields and Officer Freeman and tried to exit the jail; (2) their conduct was a substantial step toward the commission of the offense of escape; (3) they engaged in such conduct for the purpose of committing escape; and (4) the attempt to commit escape was effected by means of a dangerous instrument. The jury was further instructed: "Unless you find and believe from the evidence beyond a reasonable doubt that the attempt to commit escape was effected by means of a dangerous instrument, you must find the defendant not guilty under Count 5 of the class A felony of attempted escape from confinement as submitted in Instruction No 9." An instruction on the

---

5. Section 575.210 reads, in relevant part:

1. A person commits the crime of escape or attempted escape from confinement if, while being held in confinement after arrest for any crime, while serving a sentence after conviction for any crime, or while at an institutional treatment center operated by the department of corrections as a condition of probation or parole, he escapes or attempts to escape from confinement.
\* \* \*
3. Escape or attempted escape from confinement in a county or city correctional facility is a class D felony except that it is: (1) A class A felony if it is effected or attempted by means of a deadly weapon or dangerous instrument or by holding any person as hostage[.]

6. The relevant portion of § 571.015 reads:

1. Except as provided in subsection 4 of this section, any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action and, upon conviction, shall be punished by imprisonment by the department of corrections and human resources for a term of not less than three years. The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon[.]

elements of armed criminal action, one element of which was "by use of a dangerous instrument," was also submitted to the jury. *See* MAI–CR 3d 332.02.

Defendant only challenges the sufficiency of the evidence on the use-of-a-dangerous-instrument element of each of these two offenses. As the jury was instructed, a dangerous instrument is "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." § 556.061(9). Serious physical injury is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 556.061(28). " 'Unlike a deadly weapon, a dangerous instrument is not designed for use as a weapon and may have a normal function under ordinary circumstances.' " *State v. Eoff,* 193 S.W.3d 366, 373–74 (Mo.App.2006) (quoting *State v. Williams,* 126 S.W.3d 377, 384 (Mo. banc 2004)). The key to determining whether an object is a dangerous instrument is whether the object can kill or seriously injure "under the circumstances in which it is used." *State v. Johnson,* 182 S.W.3d 667, 672 (Mo.App.2005). Missouri courts have found a variety of seemingly innocuous objects to be dangerous instruments by analyzing whether the defendant knowingly or purposely used the object in a manner in which it was readily capable of causing death or serious physical injury. *Williams,* 126 S.W.3d at 384–85 (defendant knowingly used his car as dangerous instrument). *See also Eoff,* 193 S.W.3d at 374 (1 × 2 × 18–inch piece of wood); *Reid v. State,* 192 S.W.3d 727, 735 (Mo.

App.2006) (BB gun); *State v. Carpenter,* 72 S.W.3d 281, 283–84 (Mo.App.2002) (handcuffs); *State v. Burch,* 939 S.W.2d 525, 530 (Mo.App.1997) (elbow); *State v. Williams,* 857 S.W.2d 530, 533 (Mo.App. 1993) (boat oar); *State v. Terrell,* 751 S.W.2d 394, 395–96 (Mo.App.1988) (beer bottle); *State v. Seagraves,* 700 S.W.2d 95, 97 (Mo.App.1985) (metal bar 1 inch in diameter and 12 to 15 inches long); *State v. Davis,* 611 S.W.2d 384, 386–87 (Mo.App. 1981) (metal sign nailed to a wooden board attached to a stake).

Defendant argues that although Officer Fields testified both Reynolds and Defendant held a pen to her throat, and she had to turn away to avoid choking, "there [is] no indication that the pen was used in any other way to injure or threaten her." We disagree. Officer Fields testified that Reynolds grabbed her around the neck and forcefully pushed a sharp object underneath her jawbone, and Defendant ordered him to "go ahead and kill [her]." Reynolds further threatened her, whispering in her ear that if she did everything Defendant said, she would not be hurt. This evidence alone shows that Defendant, in concert with Reynolds, knowingly and purposely used the pen in a manner in which it was readily capable of causing death or serious physical injury.[7] *See Williams,* 126 S.W.3d at 384–85. In this context, given the soft tissue vulnerabilities of the neck and throat, the jury could have reasonably inferred that the pen was, in fact, capable of causing serious injury and death when the sharp point of that pen was pushed forcefully to that area of Officer Fields' neck, just as the Defendant threatened that it could. Defendant believed the pen was capable of killing Offi-

7. The jury was instructed that "[a] person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it."

cer Fields, because he intended that Reynolds actually use it to kill her. Thus, the threat of using the pen to harm her under those circumstances transformed it into a dangerous instrument. *State v. Tankins*, 865 S.W.2d 848, 852 (Mo.App.1993) (placing a butter knife to the throat transformed it into a dangerous instrument). While that evidence alone is sufficient, the State also presented the testimony of Officer Fields and Officer Risen that Defendant himself held the pen to Officer Fields' throat, and threatened to kill her if Officer Risen did not let him leave. Viewing the evidence in the light most favorable to the verdict, as we must, there was sufficient evidence for the jury to find beyond a reasonable doubt that Defendant used a dangerous instrument—the ink pen—in attempting to escape and committing armed criminal action. Therefore, the trial court did not err in denying Defendant's motion for judgment of acquittal at the close of all the evidence, convicting, and sentencing Defendant on these charges. Point I is denied.

### Point II—Officer Fields used as a hostage and a shield

■ In his second point relied on, Defendant contends there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of kidnapping, because the State did not establish he used Officer Fields as a hostage "since he was forced to hold her in order to be able to escape and there was no evidence that he held her as a bargaining tool in any negotiations." Defendant was charged with kidnapping, in violation of § 565.110.[8] The jury was instructed that in order to convict, the

State had to prove beyond a reasonable doubt that: (1) Defendant confined Officer Fields for a substantial period; (2) by means of forcible compulsion and without her consent; and (3) for the purpose of using her as a shield or hostage. They were also instructed that "unless you find and believe from the evidence beyond a reasonable doubt that the defendant confined [Fields] for the purpose of using her as a shield or hostage, you must find the defendant not guilty of the Class A felony of kidnapping as submitted in Instruction No. 12."

Defendant cites *State v. Lyles*, 695 S.W.2d 945 (Mo.App.1985), as support for his argument that he did not confine Fields for the purpose of using her as a hostage. In *Lyles*, the defendant confined the victim in his house and demanded written assurance that he would not be prosecuted if he released her. *Id.* at 946. The Western District of this Court looked to the plain and ordinary meaning of the word "hostage," which had not previously been defined for purposes of § 565.110. *Id.* (citing *State v. Kraus*, 530 S.W.2d 684 (Mo. banc 1975)), for the proposition that statutes should be interpreted by considering words in their plain and ordinary meaning). Using dictionaries as its guide, the Court defined "hostage" for purposes of § 565.110, as "a person held by one party in a conflict as a pledge that promises will be kept or terms met by the other party," or "a person held as a pledge or prisoner until the terms of stipulation are met." *Lyles*, 695 S.W.2d at 946. The court affirmed the defendant's kidnapping conviction, holding the victim "became his

---

8. Section 565.110, RSMo Cum.Supp.2004 states, in relevant part:
   1. A person commits the crime of kidnapping if he or she unlawfully removes another without his or her consent from the place where he or she is found or unlawfully

confines another without his or her consent for a substantial period, for the purpose of
* * *
(2) Using the person as a shield or as a hostage[.]

hostage upon his demand for written assurances that if he released her he would not be prosecuted." *Id.*

Here, Defendant argues "there is no evidence of any request or stipulation for which [Defendant] would release [Fields]." Defendant's argument is without merit. Officer Risen testified that Defendant demanded three times that he be released or else he would kill Officer Fields. Defendant himself admitted to holding onto Officer Fields and placing her in handcuffs as he negotiated for his own release, and that he began negotiating with officers "[p]retty much immediately." As the State notes in its brief, Defendant's point relied on is fatally flawed, because it admits the very facts required to prove Fields was a hostage under § 565.110; namely, that "he was forced to hold her in order to be able to escape." In other words, like the defendant in *Lyles*, Defendant was holding Officer Fields captive until the terms of his demand for release were met, and Officer Fields became a hostage as soon as he made that demand. *Id.; State v. Agnew*, 214 S.W.3d 398 (Mo.App.E.D. 2007). Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence for the jury to find beyond a reasonable doubt that Defendant confined Officer Fields for the purpose of holding her as a hostage.

▉ In the argument portion of his brief, Defendant also contends he did not use Officer Fields as a shield. Procedurally, because this issue is not raised in Defendant's point relied on, it is not subject to our review. *State v. Galvan*, 795 S.W.2d 113, 115 n. 1 (Mo.App.1990). Substantively, because this portion of the element of the offense is in the disjunctive—for the purpose of using her as a shield *or* hostage—and we have found evidentiary support for the hostage alternative, we need not address this point. However, in our *ex gratia* review, this argument is without merit. Defendant admitted at trial, as well as in his brief on appeal, that he was holding Officer Fields in front of him as he entered the deputies' room, where he encountered Officer Risen. Officer Risen testified that despite the fact he was holding out his gun, Defendant proceeded to demand his own release or else he would kill Officer Fields. This evidence was sufficient for the jury to find beyond a reasonable doubt that Defendant confined Fields with the purpose of holding her as a shield.

For the above reasons, the trial court did not err in overruling Defendant's motion for judgment of acquittal at the close of all the evidence, convicting, and sentencing Defendant for kidnapping. Point II is denied.

## IV. Decision

The judgment of the trial court is affirmed.

BATES, P.J./C.J., and GARRISON, J., concur.