**STATE of Missouri, Respondent,**

**v.**

**Roger Lenn MEYERS, Appellant.**

**No. WD 71229.**

Missouri Court of Appeals,
Western District.

Nov. 16, 2010.

Alexa I. Pearson, for Appellant.

Richard A. Starnes, for Respondent.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

**VICTOR C. HOWARD, Judge.**

Roger Meyers appeals his conviction following a jury trial for unlawful use of a weapon, section 571.030, RSMo Cum.Supp. 2009. On appeal, Meyers claims that the trial court abused its discretion in overruling his request for a mistrial and that the trial court erred in overruling his motion for judgment of acquittal because the evidence was insufficient to support the conviction. The judgment of conviction is affirmed.

**Factual and Procedural Background**

During the summer of 2008, Rhiana Holland, who was ten or eleven years old at the time, moved with her family to a home in Sedalia, Missouri. Holland became friends with her next-door neighbor, Jennifer Westerfield, who was twelve years old. The two girls often played outside together and sometimes walked to a nearby liquor store to buy soda from a machine outside the store.

One day that summer, the two girls were walking to get soda from outside the

liquor store when Westerfield stopped to talk to Roger Meyers, a man who lived in the neighborhood. Westerfield knew Meyers but Holland had never met him. Meyers told Holland that all the kids in the neighborhood call him "Old Man" or "Grandpa" and that Holland should call him by those names. Holland did not respond to Meyers. Meyers told her that if children did not call him by those names, he would drown their heads in a bucket. Meyers pointed to a bucket sitting in his yard and said that he would fill the bucket with water and dunk her head in it until she stopped breathing.

Soon after that day, the girls were walking to the store when Westerfield stopped to talk to Meyers about whether he could fix the tires on her bike. Meyers grabbed Holland tightly by her ponytail, pulled her backwards, and asked her what she was supposed to call him. When she didn't answer, Meyers took a pocketknife out of his pocket, opened the blade, and held it within one to three inches of Holland's neck. The blade of the pocketknife was approximately two inches long. Meyers did not have a smile on his face, so Holland believed that he might be serious and was not joking around. When Holland still did not respond, Meyers let her go and put the pocketknife back in his pocket. Both girls told their fathers about the incident later that evening.

Months later, Deputy John Cline of the Pettis County Sheriff's Department was asked to investigate the matter. He and another detective brought Meyers to the sheriff's office and interviewed him. Meyers initially denied that any incident involving a pocketknife occurred. Meyers then claimed that he was just joking around with some of the neighborhood girls and that he sometimes says inappropriate things when he is drinking alcohol but often does not remember it later. Al-
though Meyers claimed he was joking, he admitted that he knew he had scared Holland and had gotten her upset.

Following a jury trial, Meyers was convicted of unlawful use of a weapon in that he exhibited, in the presence of one or more persons, a weapon readily capable of lethal use in an angry or threatening manner. § 571.030.1(4). The trial court sentenced Meyers to three years imprisonment but found that if he successfully completed a 120 day treatment program, he would be released on probation. This appeal by Meyers followed.

### Request for Mistrial

■ In his first point on appeal, Meyers contends that the trial court erred in overruling his request for a mistrial after the State played a portion of his videotaped interrogation in which he said, "I guess I'll go back to prison for a while." Meyers claims that the evidence of his prior conviction was inadmissible and that the statement was prejudicial in that it influenced the jury's determination of guilt.

■ "A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed." *State v. Ward,* 242 S.W.3d 698, 704 (Mo. banc 2008). Because the trial court is in the best position to determine if the incident at issue had a prejudicial effect on the jury, the decision to grant or deny a request for a mistrial is left to the discretion of the trial court. *Id.* Therefore, we review a trial court's refusal to grant a mistrial for an abuse of discretion. *Id.* "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock the appellate court's sense of justice and indicate a lack of careful consideration." *Id.* On direct appeal, we re-

view the trial court's decision " 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *State v. Moyers*, 266 S.W.3d 272, 278 (Mo. App. W.D.2008) (quoting *State v. Johns*, 34 S.W.3d 93, 103 (Mo. banc 2000)).

Prior to trial, Meyers filed a motion in limine to preclude the State from making any reference to his prior conviction for burglary unless he chose to testify. The trial court sustained the motion, and Meyers did not testify. At trial, the prosecutor stated that he planned to offer a videotape of Meyers's interview with the detectives into evidence. The prosecutor acknowledged that many statements made in the video were inadmissible. The court had extensive discussions with the attorneys regarding the method by which the admissible portions of the video could be entered into evidence without letting the jury hear the inadmissible portions. In the event that the court allowed the prosecutor to play the video, the prosecutor had prepared a list of the inadmissible references with timestamps so that he could mute those portions of the video and prevent the jury from hearing the inadmissible material. The court eventually ruled that if the prosecutor could redact the video in that manner, the video of the interview could be played for the jury.

While the video played, the prosecutor successfully prevented the jury from hearing nearly every inadmissible portion of the interview. However, near the end of the video, the prosecutor failed to mute a segment of the video in which Meyers said, "I guess I'll go back to prison for a while." After the segment was played, Meyers objected. The prosecutor stated that he had watched the video four times and that this was the first time he had noticed the statement. The prosecutor also offered into evidence the document that listed the portions of the video with inadmissible references that he was going to mute. The prosecutor stated that he had found and successfully muted all other inadmissible references, but he had accidentally missed the final statement, and therefore it was not on the list of segments he planned to mute. He offered the document for the purpose of showing that he did not intentionally fail to mute the final statement in the video regarding Meyers's prior crime. Meyers argued that the inadmissible reference to prior crimes was so prejudicial that a mistrial was the only proper remedy.

In analyzing the prejudicial effect of a reference to evidence of other crimes, Missouri courts examine the five following factors:

1) whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; 4) whether the court promptly sustained defense counsel's objection to the statement and instructed the jury to disregard the volunteered statement; and 5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt.

*Ward*, 242 S.W.3d at 704–05. The trial court analyzed each of these factors while considering whether to grant Meyers's request for a mistrial. We agree with the trial court's analysis of each factor.

With regard to the first factor, the trial court found that there was no evidence to indicate that the prosecutor played the statement intentionally. Al-

though the prosecutor technically caused the statement to be heard by the jury in that he played the video and failed to mute the statement, as the trial court found, the record does not indicate that this was done purposefully by the prosecutor. As to the second factor, the court found that a reference to other crimes was only brought up once and that the video was immediately stopped at that point. The court also found that the statement was not further discussed or emphasized in any way before the jury. Under the third factor, the court correctly found that the statement was vague and indefinite—it intimated only that Meyers had previously been in prison and did not specify what crime he had committed.

 The trial court noted that it had sustained Meyers's objection as to the admissibility of the statement. The court did not instruct the jury to disregard the statement, but this was because counsel for Meyers specifically declined such an instruction, stating that the granting of a mistrial was the only way to eliminate any prejudice. "The fact that a defendant limits his request for relief to that of a mistrial rather than making a request for a less drastic corrective action cannot aid him." *State v. Porter*, 241 S.W.3d 385, 399–400 (Mo.App. W.D.2007). Therefore, the fourth factor, along with the first three, leans in favor of the State. As for the final factor, the trial court found that the State had made a strong case. The two girls and a law enforcement officer had testified against Meyers. In his interview, Meyers had made statements that shed light upon his involvement in the incident with the girls. We agree that, in view of the strength of the State's case,[1] which included admissions from Meyers himself,

it is doubtful that one isolated and vague comment that was never emphasized played a decisive role in the jury's determination of Meyers's guilt. Where the five relevant factors weigh in favor of the State, the statement was not so prejudicial that it denied Meyers the right to a fair trial, and the trial court did not abuse its discretion in declining to grant a mistrial. Meyers's first point is denied.

 In his second point on appeal, Meyers contends that the trial court erred in overruling his request for a mistrial in that the State made an improper and inflammatory comment during its closing argument when it referred to Meyers as a "disease." Meyers claims that the State's argument was designed to arouse the passions of the jurors to convince them to convict him for improper reasons and that the argument was prejudicial in that it decisively affected the jury's verdict.

 Where, as here, counsel for the defendant objected to the alleged improper comment, this court will reverse the trial court's decision with regard to a comment in closing argument only upon a showing that the trial court abused its discretion. *State v. Shurn*, 866 S.W.2d 447, 460 (Mo. banc 1993). Furthermore, even if the prosecution's argument was improper, reversal is only warranted where the defendant establishes that he was prejudiced in that the comment had a decisive effect on the jury's determination of guilt. *See State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007).

Meyers complains of the prejudicial effect of the following statement made by the prosecutor in his rebuttal to defense counsel's closing argument: "When you are rendering your verdict, if you want to

---

1. The sufficiency of the evidence against Meyers is discussed in our analysis of Meyers's final point on appeal.

look at that as making a medical diagnosis, I suggest to you that you render the verdict that gets this disease out of our community, at least for some period of time." Meyers argues that this comment was prejudicial in that it was designed to arouse the passions and hostilities of the jury in order to cause them to render a guilty verdict. He also claims that it was inappropriate for the prosecutor to compare the jury's duty to the making of a medical diagnosis.

What Meyers leaves out of his argument on appeal is the fact that it was his defense counsel who first introduced the "medical diagnosis" analogy to the jury. In her opening statement, Meyers's trial counsel explained the jury's role in the following manner:

> Jurors are somewhat similar to doctors. When you go to a doctor, you present your doctor with symptoms, he has to interpret those symptoms and decide what diagnosis to make. And that's what you're here to do today. We are somewhat your patients, and we're going to present evidence to you today. Your job is to take that evidence, take that—take those facts, decide what they mean, and give us a diagnosis.

Meyers's trial counsel continued in a similar vein in her closing argument:

> And one thing I told you earlier in my opening statement was that you are similar to doctors, and that your job here today is to listen to your patients tell you what their symptoms are and make a diagnosis.... I'd ask you to look at [the case] very carefully and decide what the proper diagnosis is, if we're keeping it—I know doctors say, Keep it simple, stupid. You know, why diagnose somebody with cancer when it may be a cold[?]

Meyers cannot convincingly argue that it was improper to describe the job of the jury as making a medical diagnosis where it was his own trial counsel that presented the idea to the jury in the first place. Furthermore, defense counsel's suggestion that the jury "diagnose" a cold rather than cancer most likely only served to set the stage for the prosecutor's suggestion that the jury render a verdict that would remove the "disease" from the community. While the prosecutor's comment was unnecessary to his closing argument, in light of the strength of the State's case against Meyers, we find nothing to indicate that the prosecutor's comment had a decisive effect on the jury's decision. Meyers's second point is denied.

### Sufficiency of the Evidence

In his final point on appeal, Meyers contends that the trial court erred in overruling his motion for judgment of acquittal in that there was insufficient evidence to support a conviction for unlawful use of a weapon. Meyers claims that the legislature specifically exempted pocketknives from being considered weapons readily capable of lethal use and that there was insufficient evidence to show that he possessed the requisite mental state for the offense.

▬▬ " 'In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.' " *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998) (quoting *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)). We accept as true all evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.* Where the defendant's claim raises an issue of statutory interpretation, which is a question of law, our review is *de*

*novo.* *State v. Simmons,* 270 S.W.3d 523, 531 (Mo.App. W.D.2008). "The primary objective of statutory interpretation is to ascertain the intent of the legislature and give effect to that intent as it is reflected in the plain language of the statute." *Id.*

The State charged Meyers with the unlawful use of a weapon pursuant to section 571.030.1(4), which provides that a person commits the crime of unlawful use of a weapon if he or she knowingly "[e]x-hibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner[.]" Meyers argues that the legislature has specifically excluded pocketknives from being considered weapons readily capable of lethal use. In support of his argument, Meyers cites the statutory definition of "knife" applicable to chapter 571, which describes a knife as "any dagger, dirk, stiletto, or bladed hand instrument that is readily capable of inflicting serious physical injury or death by cutting or stabbing a person. For purposes of this chapter, 'knife' does not include any ordinary pocketknife with no blade more than four inches in length[.]" § 571.010(12), RSMo Cum.Supp.2009.

Meyers interprets this language as a declaration by the legislature that ordinary pocketknives are incapable of lethal use. The State argues that the legislature's intention in excluding pocketknives from the definition of "knife" was not to declare that such knives are not capable of lethal use but, rather, was to allow people to carry concealed pocketknives, which have many legitimate uses. *See* § 571.030.1(1) (providing that a person commits the crime of unlawful use of a weapon if he or she knowingly "[c]arries concealed upon or about his or her person a knife").

We find that the State's interpretation accurately describes the intention of the legislature. If we were to accept Meyers's interpretation—that the legislature's exclusion of pocketknives from the word "knife" was a commentary on a pocketknife's lethal capabilities—it would mean that the legislature arbitrarily categorized a pocketknife with a four inch blade as incapable of lethal use but categorized a pocketknife with a blade of 4.1 inches as possibly capable of lethal use. This interpretation is illogical. It is much more likely that the legislature recognized that ordinary pocketknives with blades of four or fewer inches could be lethal but that it wished to exempt such instruments from the word "knife" so that people could legally carry small pocketknives concealed. Indeed, the word "knife" is mentioned nowhere else in section 571.030 but the portion making it a crime to carry concealed weapons. Therefore, we find that the specific exclusion of pocketknives from the word "knife" in chapter 571 does not preclude a pocketknife from being considered a weapon readily capable of lethal use under section 571.030.1(4).

Meyers next claims that the State did not prove that the pocketknife was readily capable of lethal use. Missouri courts have previously found seemingly innocuous items to be readily capable of lethal use where they were used in a similar manner as the pocketknife was used in this case. *See, e.g., State v. Arnold,* 216 S.W.3d 203, 208 (Mo.App. S.D.2007) (where the defendant grabbed the victim around the neck and held an ink pen to her neck, "given the soft tissue vulnerabilities of the neck and throat, the jury could have reasonably inferred that the pen was, in fact, capable of causing serious injury and death"). The victim testified that the blade of the knife was two inches long and that Meyers had tightly grabbed her hair, pulled her backwards by her ponytail, and held the blade within mere inches of her neck. Due to the manner in which the

pocketknife was used and the placement of the blade within inches of the delicate area of the victim's throat, the jury could have reasonably inferred that the pocketknife was readily capable of lethal use.

Finally, Meyers asserts that the State failed to prove that he had the requisite mental state required for the offense charged. Section 571.030.1(4) requires that the defendant "knowingly" exhibited, in the presence of one or more persons, a weapon readily capable of lethal use in an angry or threatening manner. Meyers claims that the State did not prove that he knew he was exhibiting the pocketknife in a threatening manner.[2]

A person acts knowingly "[w]ith respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or ... [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." § 562.016.3, RSMo 2000. Because direct evidence of a defendant's mental state rarely exists, circumstantial evidence is sufficient. *State v. Baldwin,* 290 S.W.3d 139, 143 (Mo.App. W.D.2009). A defendant's mental state "can be determined from [his] conduct before, during, and after the act." *Id.* Meyers repeatedly argues that it was not his intent to threaten the victim—but the question is not whether Meyers's purpose was to threaten Holland, it is whether he knew that his actions were threatening. Although Mey-

ers stated in his interview with the detectives that he was just joking, Holland testified that Meyers never smiled during the incident or stated that he was joking at any point. Furthermore, Meyers ultimately admitted in his interview with the detectives that he knew that he had scared Holland and had gotten her upset.[3] Therefore, the State presented sufficient evidence from which the jury could find that Meyers knew that he was exhibiting the pocketknife in a threatening manner. The trial court did not err in overruling Meyers's motion for judgment of acquittal on the basis that there was insufficient evidence to support his conviction for unlawful use of a weapon.

The judgment of conviction is affirmed.

All concur.

---

2. Meyers also contends that the State did not prove that he knew his pocketknife was readily capable of lethal use. Based on the evidence described in our analysis of whether the pocketknife was readily capable of lethal use, the jury could have inferred from the circumstances that Meyers knew the pocketknife could be lethal. Meyers knew that the knife's blade was open and that he was holding it very close to the victim's neck, which was exposed and in a vulnerable position due to Meyers's action of pulling the victim's head

back by her ponytail. Under these circumstances, there was sufficient evidence from which the jury could infer that Meyers was aware of the potentially lethal nature of the pocketknife.

3. Earlier in the interview, Meyers also stated that he often joked around with the neighborhood kids and that "some girls take it real hard" when he jokes with them.