

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,                        )
                                          )
      Plaintiff-Respondent,     )
                                          )
v.                                        )    No. SD37719
                                          )    Filed: **September 26, 2023**
TYSON J. FAIRLEY,                         )
                                          )
      Defendant-Appellant.       )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Thomas E. Mountjoy, Circuit Judge

**<u>AFFIRMED</u>**

Tyson Fairley ("Fairley") appeals the judgment of the trial court finding him guilty, after a bench trial, of first-degree rape under Section 566.030 (Count I) and first-degree sodomy under Section 566.060 (Count II). [1] Fairley raises three points on appeal. In Points I and II, Fairley challenges the sufficiency of the evidence to support his convictions. In Point III, Fairley asserts the trial court abused its discretion in admitting into evidence those parts of State's Exhibit 33 consisting of electronic messages sent by Fairley after the alleged crimes. We affirm the trial court's judgment.

---

[1] All statutory citations are to RSMo Cum. Supp. 2020.

**Factual Background and Procedural History**

In May 2018, ML was a student at Missouri State University and lived alone in a one-bedroom off-campus apartment. On May 10, 2018, ML and her friend CM planned to go out to celebrate CM's last day of classes. ML and CM met at ML's apartment after 8:00 p.m. and, before leaving ML's apartment, they both drank a shot of vodka and took Xanax. CM and ML were both about 5'1" and weighed about 115 pounds. ML and CM went to another apartment where they met CM's boyfriend and had "some shots" and maybe "a couple drinks." CM and ML had probably "seven or eight" drinks from a bottle of vodka. ML was "pretty tipsy" but "could walk around and get places."

ML, CM, and others eventually went to a bar. By the time ML arrived at the bar, ML "knew [she] was drunk" and "everything was kind of, like, spinning[.]" ML recalled telling CM's boyfriend that ML was drunk. ML recalled sitting in a booth at the bar and drinking. ML did not "remember much" after this point in the evening.

ML and CM left the bar and walked to CM's car to collect ML's keys. They planned to walk to ML's apartment two blocks away. ML recalled seeing someone talking to CM while ML was collecting her keys from the passenger floorboard of CM's car. Someone told ML they were getting a free ride from Fairley, a man ML and CM had not met. Fairley gave CM a "business card" with Lyft and Uber logos, which states:

> Preferred Rider gift from Jay: ONE Ride Free
> Text or Call: [ ]
> Thursday-Saturday after 10pm only
> *Must be redeemed by original passenger

CM observed Fairley's car had Uber and Lyft "insignia" and assumed he was an Uber or Lyft driver. ML recalled asking to be dropped off at her apartment first since it was closest at only two blocks away, but Fairley instead drove to another house first, which was significantly further

2

away.  CM's boyfriend recalled Fairley said, "I'll take good care of her[,]" referring to ML when he dropped off CM's boyfriend and CM.

When ML was alone with Fairley, ML moved to the front seat of the vehicle.  ML recalled that Fairley kept touching her leg and shoulder while they were in the vehicle.

Fairley eventually took ML to her apartment, and ML went inside but did not remember using the code required to enter the building.  Fairley followed ML into her apartment.  ML testified she stood in the doorframe of her bathroom for roughly twenty minutes texting and trying to call friends because the "driver was still in her apartment" and she was "afraid."  The State introduced text messages ML sent to CM in the early morning hours of May 11, 2018.  ML began messaging CM at 1:26 a.m. with a single word, "Viste[.]"  A minute later, she texted "*ciata[.]"  At 1:29 a.m, she sent, "Hekob[.]"  At 1:30 a.m., ML texted, "I'm still with driver[.]"  She sent the same message again at 1:35 a.m.  At 1:45 a.m., she texted, "Call my[.]"  At 1:48, ML texted "[CM,] Like forreal I[,] This drive is sll my house I[,] [CM,] Lije it's not okey I[.]"  ML also called CM twice at 1:33 a.m., once at 2:27 a.m., and again at 2:28 a.m.  At 2:31 a.m., ML texted CM, "I basically just got rapped [sic][.]"  CM's phone shows she did not respond to ML's text messages or answer her phone calls, and ML did not remember reaching anyone.  The State also introduced text messages sent by ML to CM beginning at approximately 8:00 p.m. on May 10, and those messages are largely free of errors.

ML recalled she went to lie down on her bed facedown while Fairley was by her bed.  Fairley began to rub her back.  Fairley turned ML over, took her clothes off, kissed her, and stuck his penis in her mouth.  Fairley then raped ML.  ML next remembered getting up and getting dressed.  No one else was in her apartment and the apartment door was unlocked.  After getting dressed, ML locked the door and went to lie down.  She recalled awakening to CM and

3

CM's boyfriend knocking on her door. ML then contacted law enforcement. An exam performed on May 11, 2018 revealed Fairley's sperm on ML's inner thigh near her vagina.

ML testified she believed she had a total of 10 to 15 drinks beginning around 7:30 p.m. to 8:00 p.m. on May 10 through when she left the bar, in addition to taking Xanax. The State presented evidence that mixing Xanax and alcohol exacerbates the "physiological effects" of both substances in a kind of "poly effect." ML testified she was very intoxicated when Fairley was in her apartment and she was not able to make a reasonable judgment or consent to sexual activity with anyone.

The State offered State's Exhibit 33, consisting of records provided to the State by Google in response to a search warrant. Fairley did not object to those parts of Exhibit 33 involving Fairley's online searches for CM's boyfriend's address, ML's address, and ML's full name. The rest of Exhibit 33 consists of electronic messages Fairley sent on August 15-16, 2018, several months after the May 2018 alleged crimes. On August 15-16, 2018, Fairley messaged various people with feminine names in the late evening and early morning hours asking them to contact him if they needed a ride. In a message to "Hope," Fairley stated, "Jay the Uber driver here. I'm just chilling between rides in front of Outland and thought of you. Are you out and about tonight?" Fairley sent another message the same night to "Lisa Marie" saying, "Jay here. I'm back downtown uber [sic] driving tonight. Let me know if you're in town and need to get somewhere!" Fairley sent another message on the same date, stating, "This is Jay the Uber driver. Let me know if you need meagain [sic]." The following night, Fairley sent a message to "Taylor" stating, "Did everything turn out ok last night? Thought it'd be good to check back up with you gals[.]" Taylor responded, "Hey! Lol yes thank you!!" Fairley

responded, "You bet! You were pretty lit lol! I'll be out driving tonight. Feel free to touch base if need be."

Fairley objected to the admission of the August 15-16 messages based on relevance. The trial court admitted Exhibit 33, finding Fairley's objection was a "matter of weight." The State offered additional evidence that, as of August 15-16, 2018, Fairley was not logging rides with Lyft or Uber and did not have an active Uber account. Fairley's last Lyft job was in late June 2018. Fairley's last Uber job was on May 12, 2018 and his Uber account ended on May 17, 2018. Fairley did not log the ride he gave ML on May 11, 2018 with either Uber or Lyft.

The State charged Fairley with first-degree rape under Section 566.030 and first-degree sodomy under Section 566.060. After a bench trial, the trial court found Fairley guilty of both counts and entered its judgment sentencing Fairley to ten years' imprisonment each on Counts I and II, with the sentences to be served consecutively. Fairley appealed.

## Points I and II

Fairley argues the State presented insufficient evidence from which the trial court could find him guilty of first-degree rape (Count I) and first-degree sodomy (Count II) because the State failed to present sufficient evidence from which the trial court could find Fairley "knowingly" committed the crimes, as charged by the State, at a time when ML "was incapable of consent because of intoxication and was known by [Fairley] to be unable to make a reasonable judgment as to the nature or harmfulness [of the conduct charged to constitute the offense]" under Section 556.061(14)(b). Because Fairley makes an identical argument as to both Counts and because our analysis of the sufficiency of the evidence as to incapability of consent and Fairley's knowledge of the same is dispositive of both points, we consider Points I and II together.

5

"A court reviewing the sufficiency of the evidence in a court-tried criminal case is limited to ascertaining whether the State presented sufficient evidence 'from which a trier of fact could have reasonably found the defendant guilty.'" ***State v. McCord***, 621 S.W.3d 496, 498 (Mo. banc 2021) (quoting ***State v. Vandevere***, 175 S.W.3d 107, 108 (Mo. banc 2005)). "In reviewing sufficiency of the evidence, we accept as true all evidence and inferences favorable to the State; all contrary evidence and inferences are disregarded." ***State v. Gomez***, 672 S.W.3d 113, 119 (Mo.App. 2023) (quoting ***State v. Shands***, 661 S.W.3d 381, 382 (Mo.App. 2023)). "Our assessment is not 'whether this [C]ourt believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.'" ***State v. Dickerson***, 609 S.W.3d 839, 843-44 (Mo.App. 2020) (quoting ***State v. Johnson***, 576 S.W.3d 205, 230 (Mo.App. 2019)). "We do not reweigh the evidence on appeal." ***Id.*** at 844.

Analysis

Under Sections 566.030 (first-degree rape) and 566.060 (first-degree sodomy), an element of each offense is that the crime is committed against a "person who is incapacitated, incapable of consent, or lacks the capacity to consent, or by the use of forcible compulsion." Sections 566.030; 566.060. As to "consent," Section 556.061(14)(b) provides:

> [C]onsent or lack of consent may be expressed or implied. Assent does not constitute consent if:
>
>  . . . .
>
> (b) It is given by a person who by reason of youth, mental disease or defect, intoxication, a drug-induced state, or any other reason is manifestly unable or

6

known by the actor to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense[.]

Fairley argues that, because the State presented no evidence of ML's visible intoxication at the time he committed the alleged crimes, the State failed to present sufficient evidence from which the trial court could find Fairley "knowingly" committed the crimes, as charged by the State, at a time when ML "was incapable of consent because of intoxication and was known by [Fairley] to be unable to make a reasonable judgment as to the nature or harmfulness [of the conduct charged to constitute the offense]" under Section 556.061(14)(b).

"The statutory language defining 'incapable of consent' clearly encompasses a victim who may be awake but is 'unable to make a reasonable judgment' at the time of the incident concerning the nature or harmfulness of the defendant's conduct." *Dickerson*, 609 S.W.3d at 845 (quoting Section 556.061(14)(b)). Missouri courts have long acknowledged the breadth of what evidence may support a finding that a victim is incapable of consent. *Id.*

The State presented sufficient evidence from which the trial court could find ML was incapable of consent because of intoxication and was known by Fairley to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged in Counts I and II.

ML, a female of slight build, had 10 to 15 drinks over the course of the night and took Xanax, which exacerbates the "physiological effects" of the alcohol. By the time ML arrived at the bar, ML "knew [she] was drunk" and "everything was kind of, like, spinning[.]" These facts, along with her inability to remember large parts of the evening, support the reasonable inference that ML was severely intoxicated before she encountered Fairley. The circumstances of ML's meeting with Fairley also support an inference of ML's intoxication and Fairley's knowledge of the same. ML and CM left the bar intending to walk the short distance to ML's apartment, but then Fairley, someone they had never met, offered them a free ride when they were at CM's car

and ML was already inside the car. From Fairley's offer, the trial court could reasonably infer that Fairley was able to perceive that CM and ML were too drunk to drive; otherwise, Fairley would have no reason to offer a ride to individuals already in a car. The trial court also could infer from the evidence that Fairley was a stranger to ML and CM and was sober, as he was purportedly conducting rideshare services by driving a vehicle with Lyft and Uber logos.

Fairley's conduct and statements during the drive indicate Fairley's awareness of ML's vulnerable state. Despite ML asking for Fairley to drop her off first because she lived close by, Fairley instead dropped off CM and CM's boyfriend first at a home further away. And Fairley told CM's boyfriend, "I'll take good care of her[,]" referring to ML. The trial court reasonably could infer Fairley intended to be alone with ML and could infer from Fairley's statement to CM's boyfriend that Fairley knew ML could not take care of herself.

Although ML could not recall how she entered her apartment, she recalled Fairley's presence in her apartment and her concern about his presence. The text messages ML sent to CM beginning at 1:26 a.m. on May 11 support ML's testimony that she was intoxicated and concerned about Fairley's presence in her apartment. The text messages, all unanswered, show ML's discomfort with Fairley's presence in her apartment and her desire to reach her friend for help. The extensive typographical errors in ML's text messages support a reasonable inference she was physiologically impaired. ML's inability to text coherently at this time, particularly when compared with her text messages from the early evening of May 10 (State's Exhibits 3 and 4), which were largely free of errors, supports a reasonable inference that ML was incapable of consent because of intoxication and Fairley would have observed her intoxication and still entered and remained in ML's apartment. The trial court as fact-finder had the right to believe ML's testimony that she went to lie down in bed, and then Fairley physically turned her over,

8

removed her clothes and engaged in the charged conduct with her. "The trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *State v. Emmanuel*, 667 S.W.3d 664, 671 (Mo.App. 2023) (quoting *State v. Canaday*, 476 S.W.3d 346, 354 (Mo.App. 2015)). "The fact-finder determines the credibility of witnesses, resolves conflicts in testimony, and weighs the evidence." *Id.* The trial court could infer that Fairley positioning ML in the bed and removing her clothing shows ML was incapable of consent because of intoxication and Fairley engaged in the charged conduct knowing ML was unable to make a reasonable judgment as to the nature or harmfulness of the charged conduct.

In arguing the State presented insufficient evidence for the trial court to find him guilty beyond a reasonable doubt of Counts I and II, Fairley points to testimony from ML, CM, and CM's boyfriend about their lack of memory of whether ML displayed visible signs of intoxication. In doing so, Fairley ignores our standard of review. We must "accept as true all evidence and inferences favorable to the State; all contrary evidence and inferences are disregarded." *Gomez*, 672 S.W.3d at 119 (quoting *Shands*, 661 S.W.3d at 382). Fairley argues the State failed to present sufficient evidence of ML's incapability of consent because this case lacks evidence of the physical indicia of intoxication present in *Dickerson* and *State v. Knox*, 553 S.W.3d 386 (Mo.App. 2018). *See Dickerson*, 609 S.W.3d at 847; *Knox*, 553 S.W.3d at 390-91.[2] Neither of those cases stands for the proposition that the State must present evidence of certain physical indicia of intoxication to prove a defendant's knowledge of a victim's incapability of consent because of intoxication. As set out above, the State presented sufficient

---

[2] Fairley also cites *People v. Roldan*, 42 N.E.3d 836 (Ill.App. 2015), where the court found the State presented insufficient evidence of defendant's knowledge of victim's incapability of consent due to intoxication. In that case, the trial court cited victim's "blackout state" despite there being no record evidence of victim experiencing a "blackout state" and where the evidence was that defendant and victim spent the evening with a group of friends and victim had repeatedly asked defendant to have sex with her earlier the same evening. *Id.* at 840-42. *Roldan* is so factually distinguishable to be of no aid to our analysis in this case.

evidence that ML was incapable of consent because of intoxication and was known by Fairley to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged. Here, as in **Dickerson**, "we are constrained by our standard of review to resolve conflicting evidence in favor of the [fact-finder]'s factual and credibility findings and [judgment]." 609 S.W.3d at 847. Points I and II are denied.

## Point III

In Point III, Fairley argues the trial court abused its discretion in admitting those parts of State's Exhibit 33 consisting of Fairley's electronic messages from August 15-16, 2018 because this evidence was irrelevant evidence of prior bad acts offered to insinuate Fairley has a bad character because he offered other women free rides with the desire to engage in sexual activities with them.

Standard of Review

"In a bench trial, the court is given more latitude in the admission of evidence." **State v. Coaston**, 609 S.W.3d 527, 528 (Mo.App. 2020) (citing **State v. Hein**, 553 S.W.3d 893, 896 (Mo.App. 2018)). "Thus, it is 'nearly impossible to obtain reversal based upon the improper admission of evidence in a court-tried case.'" **Id.** (quoting **State v. Franks**, 228 S.W.3d 607, 610 (Mo.App. 2007)).

Analysis

Fairley incorrectly asserts those parts of Exhibit 33 consisting of his August 15-16 messages amount to prior bad acts evidence. The messages involve events after the alleged crimes and do not appear to involve criminal activities. *See* **State v. Peal**, 393 S.W.3d 621, 627 (Mo.App. 2013) (a video depicting the defendant sifting through money and expressing how important money is to him is not prior bad acts evidence). Because Fairley has not established

10

that the messages are evidence of prior bad acts, we review Fairley's argument under a general relevance analysis.

Evidence is logically relevant if it "make[s] the existence of a material fact more or less probable." *State v. Minor*, 648 S.W.3d 721, 735 (Mo. banc 2022) (quoting *State v. Brown*, 337 S.W.3d 12, 15 (Mo. banc 2011)). Evidence is legally relevant if its probative value outweighs "the risk of 'unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" *Id.* In this case, the trial court did not abuse its discretion in admitting the messages as the trial court could have determined they were relevant in ascertaining whether Fairley acted "knowingly" and/or with the absence of mistake or accident in committing the charged acts against ML when, months after the alleged crimes, Fairley offered rides to women in the late evening and early morning hours, including to women he stated had been intoxicated when he had driven them before, and when Fairley was not logging rides with Uber or Lyft and had no active Uber account. "Because direct evidence of a defendant's mental state rarely exists, circumstantial evidence is sufficient." *State v. Meyers*, 333 S.W.3d 39, 48 (Mo.App. 2010) (citing *State v. Baldwin*, 290 S.W.3d 139, 143 (Mo.App. 2005)). "The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *State v. Hineman*, 14 S.W.3d 924, 927-28 (Mo. banc 1999) (citing *State v. Johnson*, 948 S.W.2d 161, 164 (Mo.App. 1997)).

Further, Fairley has not established prejudice from any alleged error in the admission of the messages. "We presume that trial judges in bench-tried cases will not rely on inappropriate considerations in reaching their decisions." *State v. Hicks*, 448 S.W.3d 848, 850 (Mo.App. 2014). "[W]here inadmissible evidence is admitted in a bench-tried case, 'we presume that the

11

trial judge was not prejudiced by inadmissible evidence and was not influenced by it in reaching a judgment unless it is clear from the record that the trial judge considered and relied upon the inadmissible evidence.'" *Id.* (quoting *State v. Crews*, 406 S.W.3d 91, 94-95 (Mo.App. 2013)). Fairley makes no showing that the trial court considered or relied on the allegedly inadmissible evidence and instead requests we assume the trial court did so, which we decline to do. To do so would be directly contrary to our standard of review. Point III is denied.

## Conclusion

The trial court's judgment is affirmed.


GINGER K. GOOCH, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

BECKY J.W. BORTHWICK, J. – CONCURS