

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED111774 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Franklin County |
| vs. | ) | Cause No. 18AB-CR02098-01 |
| | ) | |
| JOHN SWEARINGER III, | ) | Honorable Craig E. Hellman |
| | ) | |
| Appellant. | ) | FILED: September 17, 2024 |

Opinion

John Swearinger III (Swearinger) appeals from the trial court's judgment following his jury conviction on first-degree rape. Swearinger claims two points of error. First, he alleges the trial court erred in denying his motion for a judgment of acquittal because the State failed to present sufficient evidence Swearinger knowingly and voluntarily committed the act of first-degree rape in that he alleges he was asleep during Victim's assault. We find the trial court did not err in denying the motion for acquittal because the State presented a submissible case to the jury, establishing Swearinger acted knowingly and voluntarily. Second, Swearinger contends that the trial court plainly erred, by denying his motion for a continuance, because the denial contradicted the court's previous finding that the witness's testimony was material, and the

denial prevented him from securing the witness's appearance at trial through the Uniform Law.[1] We find his claim unpreserved as it differs from the theory presented before the trial court, and even if preserved, would not support a finding of trial court error. Finding no merit in either claim, we affirm the trial court's judgment.

<u>Background</u>

In May of 2017, Victim[2] was one of several guests at a three-day combined high school graduation party, birthday party, and camping trip at Meramec State Park. The partygoers included Swearinger, his girlfriend (Girlfriend), their infant child (Child), and Girlfriend's other children, including Girlfriend's Stepson (Graduate) and Graduate's brother (Stepson). Also in attendance were the biological mother of Graduate and Stepson (Stepson's Mother) and numerous friends, including S.J. Swearinger and Girlfriend rented two cabins: one for the young adults and one for Swearinger, Girlfriend, Child, and Girlfriend's other children. On the first night of the trip, Swearinger, Girlfriend, and the young children stayed in one cabin, while the young adults stayed in the second cabin.

On the second day of the trip, everyone attended a float trip except Girlfriend, who stayed in her cabin to attend to Child. Upon Swearinger's return from the float trip, he informed Girlfriend that they needed to leave the park because the group, including Victim, was drinking alcohol and smoking marijuana. Swearinger began grooming his eyebrows and trimming his facial hair while Girlfriend packed up their belongings. After packing their belongings and saying goodbye to the group, Girlfriend and the children drove off in one vehicle, while Swearinger left in a separate vehicle. Sometime after driving away from the park, Girlfriend

---

[1] *See* §§ 491.400–.450, RSMo. (2016), the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings.
[2] Names are redacted pursuant to § 509.520, RSMo. (Cum. Supp. 2023).

noticed Swearinger's vehicle was no longer behind her vehicle. Shortly thereafter, Swearinger texted her and informed her he had decided to remain at the park with the group.

That night, everyone spent the night in one cabin, which had two bedrooms. Victim, Swearinger, and other partygoers continued to drink alcohol and smoke marijuana throughout the evening. Originally, Swearinger planned to sleep in one of the rooms alone, while Stepson and Stepson's girlfriend slept in the other room. The rest of the group planned to sleep in the living room on the furniture or air mattresses. Rather than sleeping in his bedroom, Swearinger offered his bedroom to other partygoers, opting to sleep in the living room. Just before retiring, Swearinger asked one of Victim's friends if Victim was a heavy sleeper or if she had "taken anything."

Victim was one of the first people to fall asleep in the living room. She went to sleep on a single-person, pull-down chair that was approximately four-feet long and two-and-a-half feet wide. At some point, Victim woke up and noticed Swearinger was sleeping on an air mattress nearby. Victim fell back asleep. The second time Victim woke up, her shorts were pulled down to her thighs, she was lying on her side, and Swearinger was behind her. Victim could feel Swearinger's penis was fully inserted into her vagina, and he was slowly moving back and forth. Victim did not know what to do and continued to act as if she was still sleeping. Victim testified at trial she acted like this because she was embarrassed by what was happening and did not want any of her friends to find out. She also testified she was scared she would not be believed, did not want to answer any questions about the assault, and was worried about breaking up her friend group. At some point during the assault, Victim reached out and attempted to seek help by squeezing the hand of S.J., who was nearby, but S.J. did not wake up. At trial, Victim testified she was unsure how long the assault lasted, but stated Swearinger had sex with her for what "felt

3

like" approximately thirty minutes until Swearinger pulled back too far and his penis "slipped out" of her vagina.

Before Swearinger could resume, Victim jumped up and ran shoeless, screaming out of the cabin and into the woods, where she hid behind a tree. Some of Victim's friends were awakened by her screams. Stepson's Mother found Victim in the woods, and Victim refused to leave until another friend came out to her. When Stepson's girlfriend and S.J. came out of the cabin to her, Victim and S.J. left the campground in S.J.'s vehicle. S.J. drove Victim to a gas station, where Victim called the police.

Police escorted Victim to the hospital. Medical personnel examined Victim and described her as "tearful," "anxious," and "emotional," but "cooperative." The treating Nurse indicated Victim's injuries, including vaginal tenderness, were consistent with a penis missing the entrance of the vagina and hitting the external part of the vagina. Nurse also identified an abrasion on Victim's labia, which was consistent with Victim's statement that Swearinger used his fingers to position his penis to penetrate her vagina.

The case proceeded to a jury trial, at which the State also produced DNA evidence. A mixture of DNA was found on the inside of Swearinger's underwear that was 9.747 septillion times more likely to be a combination of Swearinger and Victim than of Swearinger and an unknown female. Presumptive seminal fluid was detected on the back of Victim's shorts.

At trial, witnesses testified that after the event Swearinger gave several explanations as to why Victim ran out of the cabin. One statement was he had no knowledge as to why Victim left the cabin so abruptly. Another statement was Victim may have fled the cabin because he may have brushed up against her feet, and another statement was that Victim may have been startled when Swearinger became cold and "laid up against" her. At trial Swearinger testified in his own

4

defense. Swearinger testified that because his air mattress was deflated Victim offered to share the chair with him, which required them to "spoon." He stated Victim began grinding on him as a form of "foreplay" he was familiar with from Girlfriend and, after some time, his penis was rubbed raw. Swearinger also testified that the head of his penis came outside of his shorts and became exposed. He claimed Victim bent his penis at a 90-degree angle and caused him to wake up from a "dream state." Specifically, he testified her buttocks "caught [his] penis and [bent it] down from where it was" to the 90-degree angle. Swearinger stated he then stopped but Victim tried to continue, which he refused, causing Victim to leave in a "huff" after ten to fifteen minutes. Swearinger testified that he did not recall ever penetrating Victim.

Girlfriend also testified at trial. Girlfriend testified Swearinger told her she had to leave on the second night because of the drug and alcohol consumption by the other partygoers. After she left the campground, Swearinger told Girlfriend he would stay behind to "keep an eye on them," and he assured her he would not sleep with Stepson's Mother. Girlfriend found this comment "weird." Girlfriend testified she and Swearinger did not engage in the kind of foreplay he described. She testified, that prior to trial, Swearinger repeatedly harassed her by telling her to stop lying about him and by using Child against her, making statements that he would "make sure that [Child] knows when she grows up that it's mommy that put daddy in jail." Girlfriend testified this harassment caused her to temporarily recant her statements prior to trial. Girlfriend testified Swearinger never told her Victim invited him to share the pull-down chair, but rather the air mattress he was sleeping on had deflated so he moved to join Victim when she was already asleep.

Swearinger moved for a judgment of acquittal at the close of State's evidence and again at the close of all evidence, which the trial court denied. Post-trial, Swearinger motioned for a

5

new trial which was likewise denied. The jury found Swearinger guilty as charged of rape in the first degree, and the trial court sentenced Swearinger to forty years in prison.

*Pre-trial motions for continuances and attempts to secure Witness S.J.'s testimony*

Prior to trial, Swearinger attempted to secure Witness S.J.'s testimony. Swearinger moved for a continuance on February 7, 2022, in order to conclude depositions, which the trial court granted. Swearinger first subpoenaed S.J. on May 12, 2022 for a deposition on June 14, 2022. Swearinger sought a second continuance on September 22, 2022, on the same grounds, which was granted, and again subpoenaed S.J. on the same day for an October 13, 2022 deposition. S.J. did not appear. Swearinger served S.J. with a third subpoena on February 29, 2023, for a deposition to occur on March 21, 2023, but S.J. did not attend. Although the record shows S.J. was incarcerated in Illinois when that subpoena was served, the subpoena had a service return. Swearinger filed a third motion for a continuance, seeking additional time to prepare for trial due to S.J.'s absence at the March 2023 deposition, which the trial court denied.

Swearinger subsequently applied for a subpoena duces tecum and summons for out-of-state witness for S.J. on March 27, 2023. In support, Swearinger alleged S.J. was "necessary and beneficial for the defense . . . in that he can provide exculpatory and impeachment evidence and evidence of possible perjury by a state's witness." No other specific evidence was alleged in support of S.J.'s materiality as a witness. In response, on March 30, 2023, the trial court issued an order of body attachment, a certificate to produce a material witness, and a notice to show cause. In its order, the trial court repeated verbatim Swearinger's statement pertaining to Witness S.J.'s materiality.

Swearinger again moved for a continuance on April 5, 2023, which was denied. On April 12, 2023, the Circuit Court of St. Clair County of Illinois issued an order directing the attendance of S.J. at Swearinger's upcoming trial, but S.J. did not appear.

Trial began on April 17, 2023, and at that time, Swearinger did not seek another continuance due to S.J.'s absence but instead proceeded to defend the case. After he was found guilty and sentenced, Swearinger renewed his claim in his motion for new trial in which he alleged the trial court erred in denying his earlier motion for a continuance to secure S.J.'s testimony. Swearinger alleged S.J. "purposely avoided [Swearinger's] efforts to compel his attendance." In the motion, Swearinger further alleged that S.J. was aware that Victim gave "contradictory statements" about the incident and that S.J. "no longer believed her story as a result." Swearinger argued, absent such critical testimony from S.J., he was unable to present a full defense at trial, thus the trial court should have granted the continuance rather than proceed without S.J. In denying Swearinger's motion for new trial, the trial court noted it had no control over S.J.'s absence at deposition or trial and that it had done everything within its power to secure S.J.'s testimony. This appeal follows.

Discussion

## I. Point One—Sufficient Evidence to Prove Knowing and Volitional Act.

### A. Standard of Review

In analyzing a trial court's decision to deny a motion for acquittal, we employ "the same standard of review used in reviewing a challenge to the sufficiency of the evidence to support a jury's guilty verdict." *State v. McCoy*, 678 S.W.3d 125, 129 (Mo. App. E.D. 2023) (quoting *State v. Bennish*, 479 S.W.3d 678, 684–85 (Mo. App. E.D. 2015)). Review of the sufficiency of the evidence is "limited in determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting

7

*State v. Minor*, 648 S.W.3d 721, 736 (Mo. banc 2022)). We view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard any evidence or inference to the contrary. *Id.* Our review assesses only whether, "in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sinks*, 652 S.W.3d 322, 334 (Mo. App. E.D. 2022) (quoting *State v. Williams*, 608 S.W.3d 205, 209 (Mo. App. W.D. 2020)). "We do not reweigh evidence on appeal." *State v. Fairley*, 676 S.W.3d 463, 469 (Mo. App. S.D. 2023) (quoting *State v. Dickerson*, 609 S.W.3d 839, 843–44 (Mo. App. E.D. 2020)).

Regarding the State's burden to prove Swearinger acted knowingly, "[b]ecause direct evidence of a defendant's mental state rarely exists, circumstantial evidence is sufficient." *State v. McClain*, 685 S.W.3d 35, 39 (Mo. App. E.D. 2024) (quoting *State v. Meyers*, 333 S.W.3d 39, 43 (Mo. App. W.D. 2009)); *see also State v. Mueller*, 568 S.W.3d 62, 66 (Mo. App. S.D. 2019) (internal citation omitted) (noting "[t]he State may prove its case by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime."). Therefore, we can determine the voluntariness of Swearinger's actions from "evidence of the defendant's conduct before the act, from the act itself, and the defendant's subsequent conduct." *See Fairley*, 676 S.W.3d at 472 (quoting *State v. Hineman*, 14 S.W.3d 924, 927–28 (Mo. banc 1999)).

B. <u>Analysis</u>

The crux of Swearinger's argument on appeal is that the State did not provide sufficient evidence that Swearinger's actions were intentional and volitional, as required for criminal liability, because he testified that he did not knowingly commit a sexual act in that he was asleep and in a "dream state." Swearinger further argues the State failed to prove his knowledge that Victim was incapacitated and/or could not consent to sexual activity as required by statute.

8

### 1. Knowing and Volitional Conduct

We first address Swearinger's claim that he is immune from criminal liability because the State did not prove he acted volitionally, given his testimony that he was in a "dream state." "[C]riminal liability is premised on a defendant's conduct involving voluntary acts." *Binion v. State*, 649 S.W.3d 359, 366 (Mo. App. E.D. 2022) (quoting *State v. Voss*, 488 S.W.3d 97, 110 (Mo. App. E.D. 2016)) (denying post-conviction relief for appellate counsel's alleged failure to challenge whether the State proved the defendant acted consciously and voluntarily in committing statutory sodomy where the evidence did not support the defendant's claim that he was asleep during the act, and thus, not criminally liable ); *see* § 562.011.1[3] (providing that "[a] person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act"). "A 'voluntary act' is defined as either (1) '[a] bodily movement performed while conscious as a result of effort or determination; or (2) [a]n omission to perform an act of which the actor is physically capable.'" *Binion*, 649 S.W.3d at 366; *see also* § 562.011.2. "The physical movements of a sleeping person are generally considered unconscious, non-volitional, and involuntary." *Binion*, 649 S.W.3d at 366 (citing *Ballew v. Aiello*, 422 S.W.2d 396, 399 (Mo. App. Spr. 1967)). Here, while Swearinger asserts he acted involuntarily, the evidence in the record is at odds with his claim. Evidence of unconsciousness, along with any affirmative acts taken by a defendant are submitted to the factfinder, who weighs the credibility of the evidence. *See State v. Weston*, 688 S.W.3d 1, 9 (Mo. App. W.D. 2024); *see also Fairley*, 676 S.W.3d at 472 (citing *Hineman*, 14 S.W.3d at 927–28); *Dickerson*, 509 S.W.3d at 844. As in the post-conviction case of *Binion*, where the jury rejected the defense of being asleep during the charged conduct, the jury in this case was free to disbelieve Swearinger's self-serving testimony that he

---

[3] All Section references are to RSMo. (2016), unless otherwise noted.

was asleep in a "dream state" when committing the charged conduct against Victim. *See Binion*, 649 S.W.3d at 367; *see also State v. Raff-Covington*, 410 S.W.3d 268, 271 (Mo. App. E.D. 2013) (internal citation omitted) ("The finder of fact may reject a defendant's self-serving testimony.")). As the sole arbiter, the jury was free to believe or disbelieve any or all of these witnesses. *See Weston*, 688 S.W.3d at 9; *Dickerson*, 509 S.W.3d at 844. The jury's rejection of Swearinger's testimony is sufficient to uphold the verdict.

### 2.   Victim's Capacity to Consent

We next address Swearinger's claim that the State failed to prove he had the requisite knowledge of Victim's inability to consent at the time he assaulted her. To prove its case of first-degree rape, the State had to prove Swearinger knowingly had sex with Victim, who was incapable of consent due to temporary incapacitation, and that Swearinger knew this when he started having sex with her. *See* § 566.030(1) ("A person commits the offense of rape in the first degree if he or she has sexual intercourse with another person who is incapacitated, incapable of consent, or lacks the capacity to consent, or by the use of forcible compulsion."). To prove this, we have consistently held it must be proven a defendant engaged in sexual intercourse ***knowing*** the victim could not "make a reasonable judgment" at the time consent is required. *Fairley*, 676 S.W.3d at 469; *Dickerson*, 609 S.W.3d at 849.

In *Dickerson*, we found defendant was aware of the victim's intoxicated state and her inability to consent to sexual contact. *Dickerson*, 609 S.W.3d at 844–45. The defendant in that case, convicted under the similarly-worded statutes of first-degree sodomy and first-degree rape, assaulted victim while she was sleeping. *Id.* at 847. The victim had been heavily ingesting drugs and imbibing alcohol, but was not "black out" drunk. *Id.* She was cognitively aware of what was happening, but not able to give consent to sexual activity, and the defendant was ultimately convicted on both offenses. *Id.*

10

Here, Victim, Swearinger, and partygoers were drinking and smoking marijuana throughout the day. As discussed below, the consistent testimony from Victim and partygoers regarding Victim's inability to render a reasonable judgment to reject or consent to sex was amply shown to the jury, thus proving Swearinger knew Victim could not consent. *See Fairley*, 676 S.W.3d at 469; *Dickerson*, 609 S.W.3d at 849.

Victim's testimony and conduct after waking up and escaping from Swearinger is indicative of one who did not consent to, or initiate sex. She fled the cabin screaming and shoeless, promptly contacted law enforcement, then submitted to a rape examination. Victim's emotional state at the hospital was described as "tearful," "anxious," and "emotional," which the jury may have found lent credibility to her testimony. Even if the State had only supported its case with Victim's testimony, it would have been sufficient, as it is "well established the 'testimony of a single witness is sufficient to support a conviction even if the testimony of the witness is inconsistent.'" *See Weston*, 688 S.W.3d at 9 (quoting *State v. Dodd*, 637 S.W.3d 659, 668 (Mo. App. W.D. 2021)). Here, far from relying solely on Victim's testimony, the State produced multiple witnesses who testified to Swearinger's conduct before and after the rape that provided circumstantial evidence of his knowledge of her incapacity and inability to consent. *See Weston*, 688 S.W.3d at 9. In particular, the jury heard testimony regarding Swearinger's unprompted questions to other partygoers asking whether Victim was a light sleeper and whether she had "taken anything." Such questions establish sufficient evidence from which a juror could reasonably infer that Swearinger planned to sexually assault Victim while she was asleep and/or under the influence of substances. Witnesses also testified how Swearinger gave up his private room to sleep in the living room with Victim and others, after having convinced Girlfriend to leave the campground early while he stayed behind, further supporting the State's proof of his

11

intent to commit the charged offense. Furthermore, the jury was presented with Swearinger's ever-shifting narrative as to why Victim fled the cabin.

The State adduced physical evidence of male DNA on Victim's shorts, Victim's hip abrasion, internal injuries consistent with penetration from behind, and a fingernail scratch on the outside of her vagina. Swearinger attempted to explain the presence of both the presumptive seminal fluid on Victim's shorts, and Victim's DNA inside of his underwear, were as a result of his erect penis becoming exposed. Specifically, he testified Victim began grinding on him, rubbing his penis raw, then bending it between her thighs and buttocks, causing him to come out of his "dream state" whereby he mistook Victim for Girlfriend, despite admitting he knew Girlfriend was not at the cabin. Swearinger alleged Victim's grinding caused him pain and made him roll away from Victim, which caused her to abruptly leave the cabin in a "huff." As with the other witnesses, the jury was free to believe all, some, or none of Swearinger's testimony, and the verdict demonstrates the jury exercised its judgment as factfinder to believe Victim's testimony and conversely disbelieve Swearinger's testimony. *See Weston*, 688 S.W.3d at 9; *Dickerson*, 609 S.W.3d at 844.

Therefore, we find the State adduced sufficient evidence proving both Swearinger's knowing and volitional conduct and his knowledge of Victim's incapacity and inability to consent to sexual intercourse to support the trial court's denial of his motion for acquittal. *See McClain*, 685 S.W.3d at 39 (citing *Meyers*, 333 S.W.3d at 43)); *Mueller*, 568 S.W.3d at 66. Point One is denied.

## II.     Point Two—Lack of Preservation for Uniform Law claim.

### A.      Standard of Review

Because the decision to grant or deny a motion for continuance is within the sound discretion of the trial court, we review the decision for an abuse of discretion. *State v. Jones*, 479

12

S.W.3d 100, 111 (Mo. banc 2016) (citing *State v. Griffin*, 848 S.W.2d 464, 468 (Mo. banc 1993)).  Reversal is appropriate "only upon a very strong showing that the court abused its discretion and prejudice resulted."  *Id.* (quoting *State v. Edwards*, 116 S.W.3d 511, 535 (Mo. banc 2003)).  The party moving for the continuance bears the burden to prove prejudice.  *Id.* (citing *State v. Schaal*, 806 S.W.2d 659, 666 (Mo. banc 1991)).  A trial court abuses its discretion when its decision to deny the motion is "clearly against the logic of the circumstances before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."  *State v. Litherland*, 477 S.W.3d 156, 163 (Mo. banc 2015) (quoting *State v. Wolf*, 91 S.W.3d 636, 645 (Mo. App. W.D. 2002)).  "If a continuance is not likely to result in the presence of the witness at trial, the court will not be held to have abused its discretion."  *Id.* (quoting *State v. Blocker*, 133 S.W.3d 502, 504 (Mo. banc 2004)).

      B.      <u>Analysis</u>

As a threshold issue, the State claims Swearinger did not preserve his claim that the trial court erred in denying his motion for a continuance based on the theory involving application of the Uniform Law.

Arguments raised for the first time on appeal are not preserved for review.  *State v. Rice*, 573 S.W.3d 53, 63 (Mo. banc 2019).  "A point is preserved for appellate review only if it is based on the same theory presented at trial."  *Id.* (quoting *State v. Johnson*, 207 S.W.3d 24, 43 (Mo. banc 2006)).  "Parties are bound by the position they took in the trial court and will not be heard on a different theory on appeal."  *State v. Wolf*, 600 S.W.3d 852, 856 (Mo. App. W.D. 2020) (internal citation omitted).  Because arguments not raised before the trial court are unpreserved, "we will not convict a trial court of error on an issue" that was not pled, presented to, or decided by it.  *Id.* We generally do not address unpreserved claims.  *State v. Brandolese*, 601 S.W.3d 519, 525 (Mo. banc 2020) (internal citation omitted).

13

Swearinger claims, for the first time on appeal, that the trial court erred by not giving him more time to ensure the procedure set forth by the Uniform Law was carried out to secure S.J.'s attendance at trial, thereby depriving Swearinger of a material witness. The record confirms Swearinger did not raise this theory of error to the trial court, and the claim is thus unpreserved for appellate review. *See Rice*, 573 S.W.3d at 63 (citing *Johnson*, 207 S.W.3d at 43); *see also Wolf*, 600 S.W.3d at 856. Instead, before the trial court, Swearinger argued only that the trial court erred in denying his motion for a continuance because S.J. was actively avoiding subpoena. Thus, because the trial court did not have the opportunity to rule on any application of the Uniform Law, we decline to convict the trial court of error on an issue it was never asked to decide. *See Wolf*, 600 S.W.3d at 856.

Swearinger alternatively seeks plain-error review, which we may grant *ex gratia* even for unpreserved claims of error. *See* Rule 30.20;[4] *Brandolese*, 601 S.W.3d at 525 (internal citation omitted). "Plain error review is discretionary, and this Court will not review a claim for plain error unless the claimed error 'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.'" *Id.* at 526 (internal quotation omitted).

Here, even were we to reach the merits of Swearinger's argument, which we do not, he would not prevail on appeal. The requirements for a continuance motion on account of the absence of witnesses or their evidence as set forth in Rule 24.10 provide that the motion ***must*** include the following:

> (a) The ***facts showing the materiality of the evidence*** sought to be obtained and due diligence upon the part of the applicant to obtain such witness or testimony;
> (b) The name and residence of such witness, if known, or, if not known, the use of diligence to obtain the same, and also ***facts showing reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time***;

---

[4] All Rule references are to M. R. Crim. P. (2023), unless otherwise noted.

(c) ***What particular facts the affiant believes the witness will prove***, and that he knows of no other person whose evidence or attendance he could have procured at the trial, by whom he can prove or so fully prove the same facts;

(d) That such witness is not absent by the connivance, consent, or procurement of the applicant, and such application is not made for vexation or delay, but in good faith for the purpose of obtaining a fair and impartial trial.

Rule 24.10 (emphases added). If a continuance is unlikely to result in the presence of a witness, it is not an abuse of discretion for the court to deny the motion. *Litherland*, 477 S.W.3d at 163 (citing *Blocker*, 133 S.W.3d at 504).

The record shows repeated unsuccessful efforts by Swearinger and the trial court to compel S.J.'s attendance at both deposition and trial. S.J.'s disregard for the trial court's directives demonstrates further continuances would not succeed in compelling his testimony. *See id.* Further, although the trial court purported to find S.J. a material witness in its order issuing a body attachment and executing a certificate for the foreign jurisdiction to issue a subpoena for S.J. to appear at trial, the court's finding was a mere recital of Swearinger's bare-bones allegation that S.J. would provide "exculpatory" and "impeachment" testimony regarding "inconsistent statements" and "possible perjury" by State witnesses. Such bare statements alone are insufficient to establish materiality of a witness or prove what particular facts S.J. would testify about. *See State v. Dierks*, 564 S.W.3d 354, 358 (Mo. App. E.D. 2018) (finding a continuance motion alleging the witness "made some incriminating statements to law enforcement" regarding defendant's drug possession was insufficient to establish materiality and comply with Rule 24.10). It was not until Swearinger's motion for new trial that the trial court was informed as to what specific testimony S.J. might have provided in Swearinger's defense. However, the question of whether the trial court erred in finding S.J. a material witness is not before us. Instead, were we to reach the merits of Swearinger's claim on appeal, we would find, despite Swearinger's inadequate showing of materiality under Rule 24.10, the trial court did

everything within its power to attempt to secure S.J.'s testimony. The trial court issued a body attachment and secured an order compelling the appearance of S.J. as an out-of-state witness. At the time of trial, there was an order from the Illinois court memorializing the Missouri court's order to compel S.J.'s appearance at trial.

In addition to the above failures to satisfy Rule 24.10, while it is clear Swearinger made numerous attempts to secure S.J.'s testimony through subpoenas, he did not attempt to secure S.J.'s testimony through the Uniform Law until three weeks before trial. A continuance is unwarranted when counsel had adequate time to prepare and secure witnesses. *State v. Chambers*, 481 S.W.3d 1, 8 (Mo. banc 2016). The record in this case is unclear whether S.J. was unwilling to testify, as Swearinger originally argued to the trial court, or whether Swearinger's trial counsel simply failed to ***timely*** secure S.J.'s attendance from his Illinois residence or while in an Illinois prison via the Uniform Law. On appeal, Swearinger insists that despite those other failed continuances, this last continuance would have secured S.J.'s attendance at trial given the Illinois court order. Yet the trial court could not defer Swearinger's trial indefinitely, and we would not find the trial court plainly erred in drawing a line where it did after years of defense-sought continuances and failed attempts to obtain any evidence from S.J. The burden was on Swearinger to prove both S.J.'s materiality and "that the attendance or testimony of such witness will be procured within a reasonable time." *See* Rule 24.10(b). Swearinger has failed to meet that burden, and the trial court has not erred, plainly or otherwise. *See Jones*, 479 S.W.3d at 111; *see also Brandolese*, 601 S.W.3d at 525 (internal quotation omitted). Point Two is denied.

## Conclusion

The judgment of the trial court is affirmed.

_Rebeca Navarro-McKelvey_
Rebeca Navarro-McKelvey, J.

Thomas C. Clark II., C.J., and
Charles H. McKenzie, Sp.J., concur.

17